**UNITED STATES**

**v.**

**Jeffrey JOHNSON and James Phillips**

**Nos. CRIM.A.00–419–3,
CRIM.A.00–419–8.**

United States District Court,
E.D. Pennsylvania.

Aug. 9, 2005.

Jerry S. Goldman, Law Offices of Jerry S. Goldman & Assoc., Philadelphia, PA, for Jeffrey Johnson.

James Phillips, Philadelphia, PA, pro se.

Christopher G. Furlong, Law Offices of Christopher G. Furlong, Media, PA, for James Phillips.

Frank R. Costello, Jr., U.S. Attorney's Office, Philadelphia, PA, for United States.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

On December 20, 2000, Jeffrey Johnson ("Johnson") and James Phillips ("Phillips") (collectively, "defendants") were convicted of conspiracy to distribute over 50 grams of cocaine base and to distribute cocaine base within one thousand feet of a public housing facility, in violation of 21 U.S.C. § 846. Phillips was also convicted of distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1), and distribution of cocaine base within one thousand feet of a public housing facility, in violation of 21 U.S.C. § 860. Presently before the Court are Johnson and Phillips's renewed motion for new trial based upon *Brady* violations and newly discovered evidence (doc. no. 414).[1] For the reasons that follow, this motion will be denied.[2]

---

1. The docket does not reflect the filing of a renewed motion for new trial by Phillips. However, in Paragraph 22 of the instant motion for new trial filed by Johnson, counsel for Johnson, Jerry S. Goldman, Esq., stated that he spoke with Phillips's counsel, Christopher Furlong, Esq., who indicated that Phillips joins in the relief requested. Accordingly, Mr. Goldman states, Johnson's renewed motion for new trial should be viewed as a joint motion.

2. Also pending is Johnson's motion for identification and production of confidential informant (doc. no. 450), in which Phillips joined (doc. no. 457). This motion will be denied without prejudice. In the event that the defendants appeal and a higher court orders a new trial, the defendants will have an opportunity to refile their motion for production of confidential informant.

## I. BACKGROUND

### A. *The Indictment*

On July 18, 2000, a Grand Jury returned an Indictment naming Jeffrey Johnson and James Phillips, along with seven others, including Jeffrey Hunt, as participants in a conspiracy to distribute cocaine base ("crack") in and around the Spring Garden Apartments, (alternatively "Spring Garden Housing Project" or "Spring Garden development") in Philadelphia from March 11, 1999 through January 11, 2000 ("Hunt conspiracy"). Specifically, Johnson and Phillips and the seven other named defendants were charged in Count One with conspiracy to distribute over 50 grams of cocaine base and to distribute cocaine base within one thousand feet of the Spring Garden Apartments, a public housing facility, all in violation of 21 U.S.C. § 846. Johnson was also charged, in connection with a transaction on May 13, 1999, in Count Three with distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1), and in Count Ten with distribution of cocaine base within one thousand feet of a public housing facility, in violation of 21 U.S.C. § 860.[3] Phillips was also charged, in connection with a transaction on December 14, 1999, in Count Eight with distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1), and in Count Fifteen with distribution of cocaine base within one thousand feet of a public housing facility, in violation of 21 U.S.C. § 860.

With regard to the conspiracy charge, the Indictment specified that cocaine base was packaged for distribution by defendant Jeffrey Hunt in clear gel caps labeled "357" and sections of clear vinyl tubing capped with wooden dowels. The Indictment identified Johnson and Phillips, among others, as persons who distributed cocaine base in and around the Spring Garden Apartments, a public housing facility owned and operated by the Philadelphia Housing Authority, including 601, 610, 622 and 635 Franklin Place and 600 Perth Place. The Indictment listed as overt acts committed in furtherance of the conspiracy, *inter alia*, a sale by Johnson of cocaine base packaged in "357" capsules to an undercover Philadelphia Police Officer on May 13, 1999 at 610 Franklin Place and a sale by Phillips of cocaine base to an individual known by the Grand Jury on December 14, 1999.

### B. *Evidence Presented at Trial*

#### 1. *Evidence of the conspiracy*

Trial for Johnson and Phillips and two of their co-defendants, Otto Barbour ("Barbour") and Dennis Jenkins ("Jenkins"), was held in December 2000. Trial revolved around the activities of the so-called Hunt conspiracy in the sale of crack cocaine at the Spring Garden Apartments from March 1999 through January 2000, packaged in non-distinct clear gel caps, gel caps labeled "357" and vinyl or plastic tubing capped with wooden dowels. The storyline of the trial was the government's effort to link the defendants to the Hunt conspiracy. While all defendants except Johnson faced distribution charges at trial, the most disputed issue as to all defendants, and the one which triggered the most substantial sentence, was the defendants' membership and participation in the Hunt conspiracy. To put it another way, the quality and quantity of the evidence linking each defendant to the Hunt conspiracy was the crucial issue in the case.

In its opening statement, the government argued that the defendants were part of a group (*i.e.*, the Hunt conspiracy) selling cocaine base or crack cocaine in the

---

**3.** Upon motion by the government, the Court dismissed Counts Three and Ten naming Johnson on December 13, 2000 (doc. no. 197).

Spring Garden development from March 1999 until January 2000. (Trial Tr. Chun, 12/13/00, doc. no. 305, at 5.) The government explained that the group distinguished itself by selling crack in a "general target area," namely the Franklin Place and Perth Place buildings located between Sixth and Eighth Streets and Green and Wallace Streets in North Philadelphia. *Id.* at 5–6. The government further explained that from at least March 1999 until the fall, the Hunt conspiracy was selling crack cocaine in "little clear gel caps, gel capsules, sort of like what you see in a Contac pill," which was "the unique packaging that this group would use to sell the crack cocaine." *Id.* at 6. According to the government, "oftentimes those gel capsules were labeled with '357,' which meant three rocks for $5 on 7th Street." *Id.*

In its case-in-chief, the government offered evidence as to the unique packaging used by the members of the conspiracy. Rashael Harris, a/k/a Rochelle Ross ("Ross"), a co-defendant who testified pursuant to a plea agreement with the government, (Trial Tr. Ross, 12/15/00, doc. no. 303, at 8), testified that she was present "a couple times" when Jeffrey Hunt cooked or packaged crack cocaine, *id.* at 19, and that she sold crack cocaine in clear gel caps and gel caps labeled "357" which she obtained from Leon Hunt, Gregory Hunt and Jeffrey Hunt, *id.* at 9–12. According to Ross, Jeffrey Hunt packaged crack cocaine in clear gel caps and gel caps labeled "357," *id.* at 16, and in vials with wooden ends, *id.* at 26. Ross explained that Jeffrey Hunt packaged crack in clear caps and gel caps with the "357 labels" because "[i]t was something different, something to separate it from anybody else's from around there." *Id.* at 16. When asked whether other non-Hunt members "were selling cocaine packets in other ways" at the Spring Garden development, she answered "yes." *Id.* at 31.

On cross-examination, Ross testified that when the cocaine base was sold in gel caps, sometimes the gel caps had a "357" on them and sometimes they did not. *Id.* at 68–69. When asked whether she told the FBI that the crack cocaine was "normally" contained in gel caps marked "357," Ross stated that she told the FBI "sometimes it did and sometimes it didn't." *Id.* at 69.

Corporal John Rodriguez, a supervisor for the Central Division of the Narcotics Bureau of the Philadelphia Police Department, which investigated drug trafficking at Franklin Place and Perth Place from March 1999 to January 2000, (Trial Tr. Rodriguez, 12/14/00, doc. no. 302, at 39–40), also testified as to the unique packaging used by alleged members of the Hunt conspiracy. When asked on cross-examination whether "the 357 on these little capsules, the little gel caps," is what made them distinctive, Corporal Rodriguez testified "[y]es, and the fact that they were contained in those plastic capsules initially." *Id.* at 62. When asked to specify whether the initial buys were "357" capsules or clear capsules, however, Corporal Rodriguez stated, "I don't know." *Id.* at 62–63.

The government also presented witnesses to support its theory that the distribution of clear gel caps occurred only in the Spring Garden development where the Hunt conspiracy operated. Officer Christina Goodwin–Laws, an undercover Philadelphia Police Officer assigned to the Narcotics Field Unit, (Trial Tr. Goodwin–Laws, 12/13/00, doc. no. 305, at 31), testified that she purchased two clear capsules labeled "357" containing crack cocaine at 635 Franklin Street on March 11, 1999. *Id.* at 34–35. She testified that two other purchases were made at this address in April 1999 by a confidential informant. *Id.* at 38–42. One purchase involved two clear

capsules each marked with "357" and tape on them, *id.* at 40, and the second purchase involved two clear capsules containing crack that were not marked, *id.* at 42. Officer Goodwin–Laws also testified that on May 13, 1999, she, along with Officer Israel Morales, purchased crack from Johnson in the area of Franklin Place by 7th Street. *Id.* at 43–44. She explained that they each received from Johnson two clear capsules containing crack cocaine. *Id.* at 44. According to Officer Goodwin–Laws, two of the four capsules were labeled "357," but she was unsure which two. *Id.* When asked whether she had seen drugs packaged in a similar nature in any other area of the city in which she worked, Officer Goodwin–Laws stated, "[n]o, never. They were unique for that particular area." *Id.* at 48.

Later, Officer Goodwin–Laws reiterated this point during the following exchange on cross-examination:

Q And here you're saying you were doing certain purchases with little capsules with the word 357 on them, is that correct?

A Some of them, yes. The others were the plastic tubes and some did not have 357.

Q Okay. And you indicated that you had never seen 357's anywhere else in Philadelphia, is that correct?

A That's correct.

Q And that's in your eight years of narcotics experience, is that correct?

A That's correct.

Q Have you ever seen clear plastic capsules anywhere in your eight years of narcotics investigation?

A Containing crack?

Q Correct.

A Not that I can recall, no.

Q Have you ever heard of any of your fellow officers receiving it in any other occasion other than this investigation,

clear plastic capsules containing crack?

A Not that I can recall, no.

*Id.* at 62–63.

Officer Leslie Simmons, a Philadelphia Police Officer who had worked in narcotics for five years, (Trial Tr. Simmons, 12/13/00, doc. no. 305, at 132), also testified that the packaging of crack cocaine in clear capsules was unique to the Spring Garden development, as evidenced by the following exchange:

Q Because the 357, in your belief, was some sort of marking?

A For that particular area, yes.

Q Okay.

A Along—not just the 357, but along with the capsules. The capsules and the 357 was basically indigenous to the Franklin Place projects.

Q Do capsules exist anywhere else in the City of Philadelphia?

A Not that I've been.

*Id.* at 171.

Officer Richard L. Cujdik, an undercover Philadelphia Police Officer in the Narcotics Field Unit, (Trial Tr. Cujdik, 12/13/00, doc. no. 305, at 206), tied trafficking of crack packaged in gel caps at the Spring Garden development to the Hunt conspiracy. Specifically, referring to 635 Franklin Place and 610 Franklin Place, he testified that the whole area was considered part of Jeffrey Hunt's organization exclusively due to the packaging of the drugs. (Trial Tr. Cujdik, 12/14/00, doc. no 302, at 12–13.)

In its closing statement, the government drove home the same point made in its opening statement and throughout the trial, *i.e.,* the defendants were part of the group (the "Hunt conspiracy") selling cocaine base in the area of the Spring Garden Apartments from March 1999 through January 2000 packaged in clear gel caps,

many of which were marked "357," and in clear vinyl tubes with wooden dowels stopping up the ends. (Trial Tr. Costello, 12/18/00, doc. no. 300, at 23–24.) The point was succinctly made in its rebuttal to the defendants' closing statements:

> The packaging was unique to the area, the caps both marked and unmarked and the gelcaps. Three experienced narcotics officers told you that. They said that. In fact, Officer Goodwin–Laws said she worked in other areas as well and had never seen that. There's no evidence that any other group was selling even the clear gelcaps anywhere else. It was here.... It tells you that there was other sales in that area but no one else but this group was selling the gelcaps, was selling clear vinyl tubing. That's what it tells you and you don't have to be an expert to know that.

*Id.* at 128–29.

### 2. *Evidence of Jeffrey Johnson's role in the conspiracy*

The government presented the following evidence at trial linking Johnson to the Hunt conspiracy. As discussed above, Officer Goodwin–Laws testified that on May 13, 1999 she, along with Officer Morales, purchased cocaine base from Johnson packaged in two gel capsules labeled "357" and two clear gel capsules in the area of Franklin Place. (Trial Tr. Goodwin–Laws, 12/13/00, doc. no. 305, at 43–44.) Officer Cujdik then testified that following Johnson's alleged sale of cocaine base on May 13, 1999 to Officers Goodwin–Laws and Morales, he, along with Officer Simmons, apprehended Johnson after a foot chase. (Trial Tr. Cujdik, 12/13/00, doc. no. 305, at 208–10). According to Officer Cujdik, he and Officer Simmons went back to where they initially saw Johnson run from police and recovered five additional "357" gel caps filled with crack cocaine from a window sill in the rear of the Franklin Place property. *Id.* at 210.

In addition to the alleged sale on May 13, 1999, the government presented witnesses who testified about two other sales of cocaine base in which Johnson was involved. Officer Harold Poles, a Philadelphia Police Officer assigned to the Narcotics Field Unit, (Trial Tr. Poles, 12/14/00, doc. no. 302, at 126), testified that on September 20, 1999, he arrested Johnson in the vicinity of Eighth and Spring Garden in possession of cocaine base packaged in 20 clear capsules, *id.* at 127–128. Officer Harry Wenger, a Philadelphia Police Officer, (Trial Tr. Wenger, 12/14/00, doc. no. 302, at 137), testified that on November 6, 1999 he, along with his partner, Officer Keenan, arrested Johnson in the area of the Spring Garden Apartments in possession of 20 clear gel caps and two tubes with seals at the end, all of which contained cocaine base, *id.* at 138–41.

Besides these three arrests, Rochelle Ross also linked Johnson to the conspiracy. Ross testified that she witnessed Johnson at 622 Franklin Place "about three or four or five times a week." (Trial Tr. Ross, 12/15/00, doc. no. 303, at 20.) When asked what Johnson was doing there, Ross answered, "getting his packs." *Id.* Ross also testified that on one occasion in July 1999, she purchased cocaine base packaged in "gel caps" from Johnson in front of 610 Franklin Place. *Id.* at 24–25.

### 3. *Evidence of James Phillips's role in the conspiracy*

The government presented the following evidence at trial to establish Phillips's guilt for the substantive distribution offenses for which he was ultimately convicted, and also to link Phillips to the Hunt conspiracy. Officer Goodwin–Laws testified that in the evening of December 14, 1999, she accompanied a confidential informant to the area of the Spring Garden Apartments, particularly the area of 619 Perth Place. (Trial

Tr. Goodwin–Laws, 12/13/00, doc. no. 305, at 51–52.) According to Officer Goodwin–Laws, while at that location she witnessed, from about twenty-five feet away, Phillips distribute to the confidential informant, in exchange for money, items which turned out to be cocaine base packaged in four plastic tubular-type items which had wooden corks at each end. *Id.* at 53–54. Officer Goodwin–Laws testified that she then notified back-up officers, provided them with a description of Phillips, and that Phillips was apprehended approximately ten minutes later on the corner of Seventh and Green Streets. *Id.* at 55.

Corporal Rodriguez testified concerning the events on December 14, 1999 as well. He testified that while working in a back-up capacity in the vicinity of the Spring Garden development he stopped Phillips based on the description of Officer Goodwin–Laws. (Trial Tr. Rodriguez, 12/14/00, doc. no. 302, at 46–47.) According to Corporal Rodriguez, Phillips was holding in his mouth what turned out to be cocaine base packaged in five plastic tubes with wooden corks on the end. *Id.* at 48–49.

Rochelle Ross also provided testimony for the government which linked Phillips to the Hunt conspiracy. Ross testified that on one occasion she purchased crack cocaine from Phillips in the courtyard of the Spring Garden Housing Project that was packaged in "wooden vials." (Trial Tr. Ross, 12/15/00, doc. no. 303, at 26–27.) She also testified that she saw Phillips at 622 Franklin Place "three or four times out of the week." *Id.* at 22. Ross, however, initially testified that she did not see him picking up any packs at 622 Franklin Place. *Id.* When asked what Phillips was doing at 622 Franklin Place, Ross testified that he was probably picking up packs. *Id.* When probed to tell what she saw Phillips doing and not what he was probably doing, Ross testified that she had seen Phillips "come out of the house with a pack." *Id.* at 22–23.

## C. Post–Trial Procedural Posture

On December 20, 2000, the jury returned a verdict of guilty against both Johnson and Phillips on the conspiracy charge. (Co-defendants Barbour and Jenkins were also convicted on this charge.) Upon further deliberation, a supplemental jury verdict was returned finding that the amount of cocaine base attributable to the conspiracy was 50 or more grams. Phillips was also convicted of distributing cocaine base, in violation of 21 U.S.C. § 841(a)(1), and distributing cocaine base within one thousand feet of a public housing facility, in violation of 21 U.S.C. § 860.

After trial, Johnson and Phillips, and co-defendant Barbour, filed motions for judgment of acquittal or for new trial. On March 12, 2001, this Court granted Barbour's motion for judgment of acquittal on the conspiracy charge, but denied Johnson's and Phillips's motions for acquittal or new trial as to that charge. *United States v. Hunt,* No. 00–419, 2001 WL 253772, at *6 (E.D.Pa. Mar.12, 2001).

With respect to Barbour, the Court, citing *United States v. Gore,* 154 F.3d 34, 40 (2d Cir.1998), found that there was insufficient evidence linking him to the charged conspiracy. The defendant in *Gore* was convicted of conspiracy to distribute heroin based only on evidence that the defendant made a single sale of heroin with the brand name "Fuji Power" to a confidential informant, and a taped conversation between the defendant and the informant *Id.* at 38–39. In the taped conversation, the defendant made reference to another person whom the government argued was a supplier linking the defendant to a conspiracy to distribute heroin with the brand name "Fuji Power" in the city of Albany, though no evidence was presented as to the exis-

tence of such a person. *Id.* at 39. The Second Circuit held that this evidence was insufficient to sustain the defendant's conspiracy conviction, explaining that the defendant's "vague statement made contemporaneously with a single heroin sale [in packaging attributable to the conspiracy] ... is too thin a reed to support the essential element of a conspiracy—the agreement." *Id.* at 41.

Finding the reasoning in *Gore* to be applicable, and recognizing that the evidence presented against Barbour consisted only of a single sale on December 2, 1999 of cocaine base packaged in clear tubing with wooden dowels and the testimony of Rochelle Ross that she purchased cocaine base in tubing with wooden dowels from Barbour at a time when Barbour was incarcerated, the Court concluded that there was insufficient evidence to sustain a conspiracy conviction against Barbour. *Hunt,* 2001 WL 253772, at *3–4.

Defendants Johnson and Phillips made the same argument under *Gore* as Barbour did. However, this Court concluded that the evidence linking Johnson and Phillips to the charged conspiracy was "much stronger." *Id.* at *4 n. 4. Specifically, this Court found that:

> Rashael Harris [Rochelle Ross] saw Phillips on numerous occasions at 622 Franklin Place, one of the conspiracy's distribution points, and once saw him leave with a pack of cocaine base. In addition, Harris [Ross] purchased cocaine base in tubing with wooden dowels from Phillips. Johnson was arrested three times with cocaine base contained in distinctive packaging, was seen by Harris [Ross] at 622 Franklin Place on numerous occasions, and sold cocaine base in clear gel caps to Harris [Ross].

*Id.*

Johnson and Phillips appealed. While their appeals were pending, Johnson filed a second motion for new trial based upon, *inter alia, Brady* /newly discovered evidence. This *Brady* /newly discovered evidence consisted of:

- The homicide file relating to the death of Odell Priest, which contained a police report referencing the discovery of a number of gel caps labeled "187" that contained crack cocaine, at the Spring Garden development, specifically at 612 Franklin Place;

- Gregory Hunt's testimony presented at Johnson's sentencing hearing stating that individuals not associated with the Hunt organization were selling crack cocaine at the Spring Garden development in clear, unmarked, gel caps; and

- An August 10, 2001 letter from the government which purportedly stated that (1) there were three other individuals who were arrested for selling crack cocaine packaged in "187" packages, (2) there were a number of seizures of other controlled substances in the vicinity of the operations of the alleged conspiracy where the drugs were packaged with labels stating "187," (3) Rochelle Ross told the government that other dealers were using gel caps, and (4) Gregory Hunt told the government that others had capsules too.

At a hearing on January 2, 2002, the Court denied Johnson's motion finding that Johnson did not meet his burden under the *Brady* standard or under the standard for a Rule 33 motion for new trial based on newly discovered evidence. In so ruling, the Court considered, both individually and collectively, the discovery of the "187" gel caps, the testimony of Gregory Hunt at Johnson's sentencing, and statements made to prosecutors by Rochelle Ross and Gregory Hunt indicating that non-Hunt members were selling crack cocaine in gel caps. (Hr'g Tr., 1/2/02, doc. no. 393, at 15–19.)

On November 12, 2003, the Court of Appeals affirmed the judgments of conviction and sentence of Johnson and Phillips. *United States v. Phillips*, 349 F.3d 138, 143 (3d Cir.2003). In doing so, the Court of Appeals rejected Johnson and Phillips's argument that there was an *Apprendi* violation for not having the jury determine the amount of crack attributable to each defendant. *Id.* at 140–41, 143. The Court of Appeals also found Johnson's and Phillips's other arguments to be without merit. *Id.* at 143 n. 5. "Phillips [had] argued that the District Court erred when it did not order a confidential informant identified and produced; when it denied his request for a Rule 29 dismissal; and when it failed to perform an *in camera* inspection of the personnel files of the arresting officers." *Id.* "Johnson [had] argued that the District Court erred when it failed to grant a new trial based on (1) a constructive amendment to the indictment or an improper variance; (2) newly discovered evidence; and (3) a *Brady* violation; and erred in its computation of the quantity of drugs attributable to him." *Id.*

■ Following the Court of Appeals decision, Johnson and Phillips filed the instant renewed motion for new trial (doc. no. 414) on December 19, 2003. Defendants' renewed motion for new trial is based upon eight items of evidence not available to defendants at trial, which defendants allege were wrongfully suppressed by the government in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[4] The alleged eight *Brady* items are as follows:

1. The discovery of gel caps bearing "187" labels, recovered by a partner of one of the witnesses who testified, during the homicide investigation, at the housing project in question, during the course of the conspiracy;

2. The discovery of other drugs packaged in gel caps, bearing the "187" label, based upon other police reports of the Philadelphia Police Department;

3. The substance of the information contained within the handwritten notes of the prosecutor assigned to the case, in the course of pre-trial preparation of Rachel Ross a/k/a Rachel Harris ("Ross") that other drug distributors, at the housing project in question, during the course of the conspiracy, were utilizing gel caps to package their crack cocaine;

4. The substance of the information contained within the handwritten notes of the prosecutor assigned to the case, in the course of a proffer of Gregory Hunt, a leader of the alleged conspiracy and government coopera-

---

4. Defendants' *Brady* claim is brought pursuant to Federal Rule of Criminal Procedure 33, which allows a defendant to file a motion for new trial on the basis of "newly discovered evidence" within three years of the guilty verdict. The parties have not addressed whether Rule 33 is the proper vehicle for raising a *Brady* claim or whether such a claim must be cabined within the jurisprudence of 28 U.S.C. § 2255. It appears that *Brady* claims are cognizable under Rule 33. *See United States v. Dansker*, 561 F.2d 485, 486 (3d Cir.1977) (holding that defendants' *Brady* claims were cognizable in a motion for a new trial under the "newly discovered" evidence clause of Rule 33). There does not appear to be any difference in the substantive standard for adjudicating *Brady* claims under Rule 33 or under 28 U.S.C. § 2255. One difference between the two provisions, however, is while Rule 33 provides a three year statute of limitations for bringing *Brady* claims, § 2255 *Brady* claims may be barred after one year. Even assuming that the one year bar under § 2255 were applicable to this case, the government has not raised this defense and therefore it is waived. *Cf. United States v. Bendolph*, 409 F.3d 155, 160–64 (3d Cir.2005) (holding that the one year statute of limitations contained in 28 U.S.C. § 2255 is a nonjurisdictional defense that is waivable by the government).

tor, that other crack cocaine dealers were distributing their drugs packaged in gel caps;

5. Information from the Philadelphia Housing Authority Police Department that during the course of the conspiracy, at the location of the conspiracy, individuals not affiliated with the Hunt organization were peddling crack cocaine packaged in gel capsules, with such individuals having been identified, arrested and prosecuted by such local authorities, including, but not limited to, the apprehension of one Dawn Benson, and the apprehension, arrest and prosecution of one Leroy Washington for an observed sale and possession on March 2, 1999 [in the Pennsylvania Court of Common Pleas, Philadelphia County, Feb. Term, 1999, No. 802];

6. Material relative to the character of the supervisory police officer involved in the case, Corporal John Rodriguez, who provided material testimony at trial, namely allegations of his involvement in a theft from drug dealer as revealed by Kenneth Spencer which was the subject of an investigation by the Federal Bureau of Investigation;

7. Material relative to the character of the supervisory police officer involved in the case, Corporal John Rodriguez, who provided material testimony at trial, namely allegations of his involvement in a second theft from an alleged participant in a narcotics related transaction, as set forth in the *Roberts Report,* which was the subject of an investigation by the Federal Bureau of Investigation and which still has not been disclosed by the Government; and

8. Material relative to the allegation of a theft from a drug dealer, Reginald Harris, during the course of this very investigation, involving Police Officers Simmons and Cujdik, who provided material testimony at trial.

(Johnson's Suppl. Mem. 5–7.)[5] Defendants also contend that other newly discovered evidence, not wrongfully suppressed, was material to the outcome of the case. This newly discovered evidence consists of:

9. Information from a leader of the conspiracy, Gregory Hunt that the use of clear unmarked gel caps, by the conspirators, were exceedingly rare;

10. Information from Gregory Hunt that such use of gel caps by the conspirators ended prior to the summer of 1999;

11. Information from Gregory Hunt that there were other, unrelated, drug dealers operating in the area;

12. Information from Gregory Hunt that other drug dealers were using clear gel caps and that the purpose of the "357" label was so that the Hunt gel caps would not be confused with those of competitive dealers;

13. Identification of the "Steve," referred to by Gregory Hunt as a dealer of clear gel caps not affiliated with the conspirators, at the Spring Garden Projects, as one Steven Deveraux a/k/a Steve Hopkins (his 'partner' Kaleef remains unidentified); and

14. Identification of other non-Hunt organization dealers selling crack packaged in gel caps in the geographic area in question as the "Meatloaf" organization (including Richard Thigpen and Lionel Simmons, both of

---

5. Johnson's Supplemental Memorandum was submitted to the Court, but never filed of record.

whom had been arrested at the time) and "Fred."

*Id.* at 7–11 (renumbered for this Opinion).

With respect to the eight alleged *Brady* items (1 thru 8), the government concedes that four of the items, particularly items 3, 4, 6 and 7, were wrongfully suppressed and should have been disclosed prior to trial. (Gov't's Resp. 7.)[6] On the other hand, the government contends that items 1, 2, 5, and 8 should not be considered in determining whether the defendants are entitled to a new trial. With respect to items 1 and 2, pertaining to information about the discovery of gel caps bearing "187" labels found at the Spring Garden Apartments, the government avers that the Odell Priest homicide file was maintained by the Philadelphia District Attorney's Office and was requested by Johnson prior to trial specifically for the purpose of impeaching Gregory Hunt or Jeffrey Hunt. *Id.* at 7–8. The government asserts that because neither of the Hunt defendants was called as a witness, the file was never obtained nor reviewed by anyone from the United States Attorney's Office prior to trial. *Id.* at 8. According to the government, it obtained the file only prior to calling Gregory Hunt as a witness for sentencing. *Id.*

With respect to item 5, pertaining to information about the arrest of two defendants by the Philadelphia Housing Authority Police Department for selling cocaine base in clear gel caps in March 1999, the government avers that it had no way of knowing of the local prosecution of the case involving Dawn Benson and Leroy Washington. *Id.* at 9. According to the government, the prosecution of Dawn Benson and Leroy Washington was not mentioned in any of the reports pertaining to the instant investigation. *Id.*

Finally, with respect to item 8, pertaining to the allegation of a theft from a drug dealer, Reginald Harris, the government avers that such allegation was not discovered until well after the trial. *Id.* Johnson concedes this point in his supporting memorandum as he states that he was sentenced seven days after the government received this information. (Johnson's Suppl. Mem. 39.) According to a March 17, 2004 letter signed by Assistant United States Attorney Frank R. Costello, Jr. and addressed to Johnson's counsel, the information concerning Reginald Harris derived from an interview of Harris on February 6, 2002. (Johnson's Suppl. Mem., Ex. 8.) In that interview, Harris alleged that when his residence was searched in January, 2000, he had $63,000 in cash that was taken, not the $19,000 reported by the police. *Id.* Harris also alleged that the police took some jewelry. *Id.* Mr. Costello avers that to his knowledge the Harris interview was never written up. *Id.*

Accompanying the March 17, 2004 letter from Mr. Costello was a police report pertaining to the initial search and investigation of Harris. That report, prepared by Police Officer Simmons, stated that Officer Cujdik was the confiscating officer of $19,996 along with drugs, guns and other items. (Johnson's Suppl. Mem., Ex. 8, Police Rep. at 13.)

## II. DISCUSSION

### A. *The Brady Claim*

In the landmark case of *Brady v. Maryland,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83

---

**6.** The government's Response was submitted to the Court, but never filed of record.

S.Ct. 1194, 10 L.Ed.2d 215 (1963). Since *Brady,* the Supreme Court has rendered the duty upon the prosecution to disclose material evidence applicable even where there has been no request for such evidence by the defendant, *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and regardless of whether such evidence pertains to impeachment or exculpatory evidence, *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

██ The purpose of the *Brady* rule "is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *Bagley,* 473 U.S. at 675, 105 S.Ct. 3375. To establish a *Brady* due process violation a defendant must show that: " '(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment.' " *United States v. Pelullo,* 399 F.3d 197, 209 (3d Cir.2005) (quoting *United States v. Dixon,* 132 F.3d 192, 199 (5th Cir.1997)). As the Third Circuit has implicitly recognized, the inquiry in essence is twofold: (1) whether favorable evidence in the possession of the government was actually suppressed,[7] and (2) whether the suppressed evidence was material to the outcome of the trial. *Slutzker v. Johnson,* 393 F.3d 373, 386 (3d Cir. 2004). The Court will address each question in turn.

#### 1. *Suppression of favorable evidence prior to trial*

The government concedes that items 3 and 4 above, pertaining to pretrial statements made by Rashael Harris, a/k/a Rochelle Ross, and Gregory Hunt in the presence of the prosecutor, and items 6 and 7, pertaining to impeachment of Corporal

Rodriguez, were wrongfully suppressed prior to the defendants' trial.

On the other hand, the government avers that item 8, pertaining to the allegation of a theft from a drug dealer, Reginald Harris, was not wrongfully suppressed prior to trial because prosecutors first learned of this alleged theft in an interview with Reginald Harris on February 6, 2002, more than a year after trial. In fact, Johnson concedes that the government came into possession of item 8 after trial. Thus, there is no issue of suppression as to items 3, 4, 6, 7 and 8.

██ It is items 1, 2 and 5 to which the Court must now turn. With respect to items 1 and 2, pertaining to the discovery of gel caps bearing "187" labels found at the Spring Garden Housing Project, this information derived from the Odell Priest homicide file, which was maintained by the Philadelphia District Attorney's Office prior to trial. The government concedes that this file was requested by Johnson for purposes of impeaching Gregory Hunt and Jeffrey Hunt, but because neither individual was called as a witness, the file was never obtained nor reviewed by anyone from the United States Attorney's Office. This explanation for not disclosing the Odell Priest file cannot be accepted.

██ The United States Attorney's Office, as the prosecutor in this case, not only had a duty to disclose favorable material evidence in its possession, but it also had a duty to learn of and disclose any favorable evidence known to others acting on its behalf, including police investigators working on the case. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety–Div. of State Police,* 411 F.3d 427, 443 (3d Cir.

---

**7.** Axiomatically, if evidence is not favorable it would not constitute *Brady* material (*i.e.,* the evidence must have been favorable before a duty to disclose arises).

2005). Police officers are not equipped to perform this role on their own, *Gibson*, 411 F.3d at 443, and the prosecutor's good faith or bad faith is irrelevant, *Kyles*, 514 U.S. at 437–38, 115 S.Ct. 1555.

Thus, because the Odell Priest file was a product of an investigation by the Philadelphia Police Department, which also was responsible for the initial investigation of the Hunt group's drug activities at the Spring Garden Apartments, and of the Philadelphia District Attorney's Office, the United States Attorney's Office had an obligation to disclose any favorable evidence in this file known to the Philadelphia Police Department or Philadelphia District Attorney's Office. It follows that to the extent the information about the "187" capsules in the Odell Priest file was favorable to the defendants, items 1 and 2 should have been disclosed.

■ With respect to item 5, pertaining to information from the Philadelphia Housing Authority Police Department about the apprehension of Dawn Benson and the arrest and prosecution of Leroy Washington for peddling crack cocaine in gel capsules at the same location as the Hunt conspiracy, there is no evidence that the United States Attorney's Office possessed this information prior to trial. Moreover, there is no indication that prosecutors in this case and the Philadelphia Housing Authority Police Department "engaged in a joint investigation or otherwise shared labor and resources," which would impute possession of this information to the prosecutors. *See Pelullo*, 399 F.3d at 218. While there were officers from the Philadelphia Housing Authority Police Department who testified at the defendants' trial about drug seizures in the area of the Spring Garden Housing Project, the defendants have offered no evidence to suggest that these officers were working on behalf of the United States Attorney's Office. In fact, according to the government, there was no contacts with Philadelphia Housing Authority police officers other than subpoenaing the officers who testified about the drug seizures. (Hr'g Tr. Costello, 11/29/04, doc. no. 469, at 43.) Therefore, the United States Attorney's Office had no duty to learn of or disclose information from the Philadelphia Housing Authority Police Department. The Third Circuit has made clear that "*Kyles* cannot 'be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue." ' *Pelullo*, 399 F.3d at 216 (quoting *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir.2003)). Therefore, item 5 need not have been disclosed.

### 2. *Materiality*

■ Next, the issue is whether suppression of items 1, 2, 3, 4, 6 and 7 was material to the outcome of the trial. The touchstone of materiality is whether there is a reasonable probability of a different result. *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Thus, "the materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Banks v. Dretke*, 540 U.S. 668, 698, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (quoting *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555). This is a relatively lenient standard. *United States v. Mitchell*, 365 F.3d 215, 254 (3d Cir.2004). A defendant need not demonstrate by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted in the defendant's acquittal.

*Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. Nor must a defendant "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough to convict." *Id.* at 434–35, 115 S.Ct. 1555. Simply put, a defendant need only show that "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

■■■ In deciding whether the government's suppression of items 1, 2, 3, 4, 6 and 7 undermines confidence in the outcome of the trial, the suppressed evidence must be considered collectively, not item by item. *See id.* at 436, 115 S.Ct. 1555. At the same time, the suppressed evidence must be considered separately with respect to the government's case against Johnson and with respect to the government's case against Phillips. Even assuming that the suppressed evidence, that is items 1, 2, 3, 4, 6 and 7, are favorable to the defense, the Court finds that this evidence is not material.

### a. *Materiality as to Jeffrey Johnson*

■■■ On January 2, 2002, this Court considered the substance of items 1, 2, 3 and 4, both individually and collectively, and found this evidence not to be material to Johnson's conspiracy conviction. (Hr'g Tr., 1/2/02, doc. no. 393, at 15–19.) The Court of Appeals affirmed this ruling, finding Johnson's *Brady* argument to be without merit. *Phillips,* 349 F.3d at 143 n. 5. The question now is whether adding items 6 and 7 to the Court's materiality calculus gets Johnson over the threshold. In other words, the issue is whether items 6 and 7 now, together with items 1, 2, 3 and 4 (previously considered by the Court), un-dermine confidence in the jury's verdict. The Court finds that they do not.

Item 6 comprises allegations that Corporal Rodriguez participated in a drug raid during which $10,000 was allegedly missing. Item 7 comprises a report by Philadelphia Police Department investigators, produced in response to a citizen complaint that $375 was stolen by police during a drug bust, that concludes Corporal Rodriguez was less than truthful. First, it is doubtful that these items would have been admissible at trial to impeach Corporal Rodriguez.[8] Even if admissible, these items do little to change the full landscape of evidence mounted against Johnson. They serve only to impeach the general character of Corporal Rodriguez for truthfulness, *i.e.,* to undermine the credibility of his testimony at trial. The only relevant testimony offered by Corporal Rodriguez in the case against Johnson was that the use of "357" gel caps and clear gel caps was unique to the Hunt conspiracy. The unimpeached testimony of other officers, however, namely Officers Goodwin–Laws, Simmons and Cujdik, also tied the use of "357" gel caps and clear gel caps to the Hunt conspiracy at the Spring Garden development as did the testimony of Rochelle Ross. Thus, even assuming *arguendo* that the use of items 6 and 7 would have tended to discredit Corporal Rodriguez's testimony at trial, given the strength of the other evidence tying the use of "357" gel caps and clear gel caps to the Hunt conspiracy, confidence in the guilty verdict against Johnson has not been undermined.

### b. *Materiality as to James Phillips*

■■■ The Court has not previously considered the impact of items 1, 2, 3 and 4 with respect to Phillips's convictions be-

---

**8.** See Federal Rules of Evidence 608(b), 801 and 802. Additionally, these items would have to pass muster under Federal Rule of Evidence 403. If admissible, they could not be proven by extrinsic evidence. Fed.R.Civ.P. 608(b).

cause he was not a party to Johnson's previous motion for new trial that was denied by the Court on January 2, 2002. Nevertheless, the Court concludes that items 1, 2, 3 and 4, when viewed collectively with items 6 and 7, are not material to Phillip's conspiracy conviction nor are they material to his distribution convictions.

With respect to Phillips's conspiracy conviction, the evidence presented at trial tying Phillips to the Hunt conspiracy consisted of: (1) the testimony of Officer Goodwin–Laws stating that on December 14, 1999 she witnessed Phillips sell a confidential informant crack cocaine packaged in four plastic vials capped with wooden dowels; (2) the testimony of Corporal Rodriguez stating that he apprehended Phillips on December 14, 1999 after the sale to the confidential informant and that Phillips was holding five plastic vials capped with wooden dowels filled with crack cocaine; (3) the testimony of Rochelle Ross stating that on one occasion she purchased crack cocaine from Phillips at the Spring Garden development packaged in "wooden vials;" and (4) the testimony of Rochelle Ross stating that she saw Phillips at 622 Franklin Place three or four times out of the week and that she had seen Phillips "come out of the house with a pack." Notably absent is evidence that Phillips sold or possessed crack cocaine packaged in gel caps, whether clear or with a "357" marking. Thus, insofar as items 1, 2, 3 and 4 tend to prove that gel caps were not exclusive to the Hunt conspiracy, these items are not material to Phillips's case.

In fact, counsel for Phillips concedes that the import of the *Brady* evidence to Phillips's case goes solely to the issue of credibility of the witnesses who testified against Phillips. (Hr'g Tr. Furlong, 11/29/04, doc. no. 469, at 28–29.) With respect to the materiality of impeachment evidence, the Supreme Court has observed:

When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within [the] general rule [of *Brady* ]. We do not, however, automatically require a new trial whenever "a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." ... A finding of materiality of the evidence is required under *Brady*.... A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ...."

*Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (citations omitted).

With this observation in mind, the Court must ultimately determine the materiality of item 3 (Rochelle Ross's documented statements to prosecutors about the packaging of drugs in gel caps), which defendants argue are inconsistent with her trial testimony, and item 6 (allegations that Corporal Rodriguez participated in a drug raid during which $10,000 was allegedly missing) and item 7 (a report by Philadelphia Police Department investigators, produced in response to a citizen complaint that $375 was stolen by police during a drug bust, stating that Corporal Rodriguez was less than truthful in the investigation), which tend to discredit Corporal Rodriguez's credibility.

As to item 3, Phillips argues that, at trial, Ross testified that the Hunt conspirators sold crack cocaine packaged in clear gel caps or gel caps labeled "357" to distinguish or separate their product from drugs sold by non-Hunt members and that, although other drug dealers also sold cocaine in the same geographic area, they packaged the cocaine differently from the way it was packaged by the Hunt conspira-

tors. By contrast, according to Phillips, at the pre-trial interview, Ross told the prosecutors that other non-Hunt members used gel caps to package crack cocaine.[9]

Phillips reads too much into Ross's trial testimony. While Ross testified that the Hunt conspirators used gel caps to package crack cocaine, and, in response to a leading question,[10] that other non-Hunt members packaged their drugs differently, Ross was never asked, and therefore she never testified, as to whether Non–Hunt members also used gel caps to package their drugs. Put another way, what Phillips detects in Ross's trial testimony is not an inconsistency as much as it is a gap. Thus, given that the alleged conflict is more nuanced than direct, the Court concludes that it would not have undermined the reliability of Ross's trial testimony and was "not likely to have changed the verdict." *See Giglio*, 405 U.S. at 154, 92 S.Ct. 763.

Similarly, neither item 6 or item 7, which potentially would have been used to impeach the testimony of Corporal Rodriguez concerning the sale by Phillips of crack cocaine in vinyl tubing with wooden dowels to a confidential informant, is likely to have changed the verdict. This sale is the transaction which forms the basis for Phillips's distribution convictions. Even if the testimony of Corporal Rodriguez were completely discredited through the cross-examination of Corporal Rodriguez about the allegations described in items 6 and 7, his testimony merely corroborates the unimpeached testimony of Officer Goodwin–Laws, who directly witnessed Phillips sell cocaine base in plastic tubes with wooden dowels to the confidential informant.

Consequently, the Court cannot conclude that there is a reasonable probability that had items 3, 6 and 7 been turned over prior to trial, Phillips would not have been convicted of conspiracy to distribute cocaine base, distribution of cocaine base, and distribution of cocaine base within one thousand feet of a public housing facility.

### B. The Impact of Other Newly Discovered Evidence

 The defendants alternatively argue that they are entitled to a new trial under Federal Rule of Criminal Procedure 33 based on the totality of the suppressed evidence already analyzed under the *Brady* standard in conjunction with several additional pieces of newly discovered evi-

---

9. According to Johnson's supporting memorandum, which Phillips adopts, the substance of the information contained within the prosecutor's notes was that:

 [O]ther drug distributors, at the housing project in question, during the course of the conspiracy, were utilizing gel caps to package their crack cocaine.

 (Johnson's Suppl. Mem. at 5 adopted by Phillips in Phillips's Mem. in Supp. of Mot. for New Trial, doc. no. 466, at 1.) It is not entirely clear whether this language was taken directly from the notes of the prosecutor or whether it reflects Johnson and Phillips's characterization of what the notes said. Even accepting that this language mirrors the language in the notes of the prosecutor, the notes are hardly verbatim and cannot be said to reflect Ross's actual statements to prosecutors. For example, the notes refer to "other

drug distributors" "utilizing gel caps." A review of Ross's trial testimony indicates that the wording used by the notetaker would not have been in Ross's vocabulary.

10. Ross testified:

 Q Do you know if any other people sold in that area out where you were? Did you see anybody selling out there?
 A Yes.
 Q And do you know if they were working for Jeffrey Hunt?
 A No, they wasn't.
 Q There were other people doing that?
 A Yes.
 Q And they were selling cocaine packets in other ways, weren't they?
 A Yes.

 (Trial Tr. Ross, 12/15/00, doc. no. 303, at 16.)

dence. A new trial based on newly discovered evidence is warranted when the following requirements are satisfied:

(a) the evidence must be[,] in fact, newly discovered, *i.e.*, discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) evidence relied on[ ] must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Jasin*, 280 F.3d 355, 361 (3d Cir.2002) (quoting *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976)). "The movant has a 'heavy burden' in meeting these requirements." *United States v. Saada*, 212 F.3d 210, 216 (3d Cir.2000) (citing *United States v. Ashfield*, 735 F.2d 101, 112 (3d Cir.1984)).

 The Court has already determined that *Brady* items 1, 2, 3, 4, 6 and 7, when viewed collectively for *Brady* purposes, do not establish a "reasonable probability" of a different outcome for either Johnson or Phillips. Therefore, the more demanding standard imposed for motions for new trial based on newly discovered evidence, *i.e.*, that the evidence would probably produce an acquittal, is not met when these items alone are considered. Thus, the question then is whether *Brady* item 5, pertaining to the prosecution of others for peddling crack cocaine in clear gel caps, and *Brady* item 8, constituting an allegation of theft that occurred during a drug bust in which Officers Simmons and Cujdik were involved, along with six other items of alleged newly discovered evidence, when viewed collectively with *Brady* items 1, 2, 3, 4, 6 and 7, would have produced an acquittal. For the reasons that follow the answer to this question is they would not have.

First, with respect to *Brady* item 5 and all of the newly discovered items described in Part I(C) of this Memorandum, this evidence weakens the government's argument at trial that the sale or possession of clear gel caps at the Spring Garden development equates to membership in the Hunt conspiracy. Nevertheless, the Court cannot conclude that had this evidence been available prior to trial Johnson would probably have been acquitted because there was still substantial other evidence that Johnson was peddling crack cocaine in plastic or vinyl tubes capped with wooden dowels and in "357" gel caps. On point, the evidence at trial allowed the jury to conclude that both of these methods of packaging crack cocaine were used by the Hunt conspiracy exclusively. In fact, with respect to the "357" gel caps, item 12 of the newly discovered evidence described in Part I(C) above is "[i]nformation from Gregory Hunt that other drug dealers were using clear gel caps and that the purpose of the '357' label was so that the Hunt gel caps would not be confused with those of competitive dealers." (Johnson's Suppl. Memo., at 9.)

As for the import of *Brady* item 5 and the newly discovered evidence described in Part I(C) of this Memorandum to Phillips, this evidence has no impact because Phillips was not linked to the Hunt conspiracy through the sale or possession of gel caps. Instead, the witnesses who linked Phillips to the conspiracy testified that Phillips either sold or possessed crack cocaine packaged in vinyl or plastic vials capped with wooden dowels. To reiterate, the evidence shows that no one but Hunt members were dealing drugs in this manner at the Spring Garden development or anywhere else.

 Second, *Brady* item 8, constituting an allegation of a theft that occurred during the drug bust of Reginald Harris in which Officers Simmons and Cu-

jdik were involved, would have been inadmissible at trial under Federal Rule of Evidence 608(b). Rule 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed.R.Evid. 608(b). Here, the allegation that Officers Simmons and Cujdik were somehow involved in a theft during a drug raid is not probative of their truthfulness or untruthfulness. According to the Third Circuit, crimes of dishonesty under Federal Rule of Evidence 609 are "those crimes that bear on a witness' propensity to testify truthfully," *Walker v. Horn*, 385 F.3d 321, 333 (3d Cir.2004), which the Third Circuit describes as those crimes that involve communicative or expressive dishonesty, *id.* at 334. Based on this understanding of what it means "to bear on a witness' propensity to testify truthfully," which is another way of saying "to be probative of truthfulness or untruthfulness," the Court concludes that alleged instances of theft are probative of truthfulness or untruthfulness where they involve communicative or expressive dishonesty. In the instant matter there is no evidence that the alleged theft from Reginald Harris, if it took place at all, involved communicative or expressive dishonesty, *ergo*, it is not probative of truthfulness or untruthfulness.

Even if such an allegation of theft were probative of truthfulness or untruthfulness, it would not be admissible under Federal Rule of Evidence 403. Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." Fed.R.Evid. 403. Here, the probative value of cross-examination testimony of Officers Simmons and Cujdik about the alleged theft of cash from Reginald Harris is substantially outweighed by the danger of unfair prejudice since the role of these officers in that alleged theft has never been substantiated. *Cf. Sabir v. Jowett*, No. Civ. A.3:97CV2249CFD, 2001 WL 640407, at *2 (D.Conn. May 30, 2001) (finding that the probative value of cross-examination about charges that a state police officer witness misappropriated money or stole property was substantially outweighed by the danger of unfair prejudice and the risk of misleading the jury because the officer was exonerated on those charges).

For these reasons, when viewing all of the *Brady* items and additional items of newly discovered evidence introduced by defendants in their renewed motion for new trial, both independently and collectively, it cannot be said that such evidence probably would have produced an acquittal.

## III. CONCLUSION

Having reviewed the suppressed *Brady* items, namely items 1, 2, 3, 4, 6 and 7, both independently and collectively, the Court cannot conclude that the guilty verdicts against either Jeffrey Johnson or James Phillips have been undermined. Nor can the Court conclude, when reviewing the suppressed *Brady* items together with the additional newly discovered evidence detailed in Part I(C) of this Memorandum,

that this evidence probably would have produced an acquittal. Therefore, the Court must deny Johnson and Phillips's renewed motion for new trial.

An appropriate Order follows.

## ORDER

**AND NOW**, this 9th day of August, 2005, it is hereby ORDERED that:

1. The renewed motion for new trial filed by Jeffrey Johnson and James Phillips (doc. no 414) is **DENIED**; and

2. The renewed motion for identification and production of confidential informants (doc. no. 450), in which Phillips has joined (doc. no. 457), is **DENIED WITHOUT PREJUDICE.**

**AND IT IS SO ORDERED.**